**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| DR. RUDOLPH CREW, | ) | CIVIL ACTION FILE |
| | ) | NO. _____ |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| DEKALB COUNTY SCHOOL DISTRICT | ) | |
| and | ) | |
| DR. JOYCE MORLEY in her | ) | |
| Individual capacity | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

## COMPLAINT

Plaintiff Dr. Rudolph Crew ("Plaintiff" or "Crew") respectfully submits the following Complaint.

## INTRODUCTION

This is a case of age and race discrimination. It arises from Defendant DeKalb County School District's failure to hire Crew as Superintendent in May 2020.

Defendant DeKalb County School District (DCSD), acting through its

governing body, the DeKalb County Board of Education (the "Board") vetted approximately 70 applicants from all over the country. After this months-long process, the Board voted 6-1 in favor of hiring Crew, publicly announcing him as the sole finalist for the position. A few weeks later, however, the Board voted 4-3 to reject Crew.

During the selection process, multiple Board Members made ageist comments about Crew. Some of these ageist comments were made directly to Crew; some were made during Board executive sessions; some were made to constituents; others were made in the context of efforts to find younger candidates to replace Crew. The Board Members who made these comments voted against hiring Crew.

Meanwhile, at least one Board Member, Defendant Dr. Joyce Morley ("Morley'), made negative racial comments about Crew. Morley disparaged Crew because his late wife was white, claiming this meant he did not respect Black women (like her). She baselessly claimed Crew was too deferential to the Board's white members and sought to undermine Crew's selection out of racial animus and suspicion toward the white Board Members who supported Crew. Morley has made other racially discriminatory statements. For example, in a September 2020 Board Meeting, she publicly claimed "the Whites" would disregard COVID-19 precautions if DCSD reopens for in-person education.

After reneging on Crew, the Board quickly hired Cheryl Watson-Harris ("Watson-Harris") as DCSD's new Superintendent instead. Watson-Harris is substantially younger than Crew. She is dramatically less qualified and experienced than him. She was ranked lower than Crew by the search firm the Board retained to vet its candidates. When publicly announcing the Board's selection of Watson-Harris, Board Chairman Marshall Orson ("Orson") held her out as "part of the next generation of outstanding leaders in public education," confirming the Board selected her instead of Crew because of age bias.

Crew brings this lawsuit to vindicate his rights to be free from age and race discrimination. Crew brings the follow claims against Defendant DCSD:

- an age discrimination claim under the Age Discrimination in Employment Act ("ADEA), 29 U.S.C. § 621, *et seq.*;

- a race discrimination claim under 42 U.S.C. § 1981 (actionable via 42 U.S.C. § 1983);

- and a race discrimination claim under the Equal Protection Clause of the U.S. Constitution (also actionable via 42 U.S.C. § 1983).

Crew also brings claims of race discrimination against Defendant Morley in her individual capacity under 42 U.S.C. § 1981 and the Equal Protection Clause (both actionable via 42 U.S.C. § 1983).  Finally, Crew anticipates amending this

Complaint to add a Title VII race discrimination claim against DCSD once a Right to Sue is issued by the EEOC.

Crew seeks legal and equitable relief including back pay, ADEA liquidated damages, front pay, emotional damages, punitive damages against Morley, and his attorneys' fees and costs.

## JURISDICTION AND VENUE

1.      Crew's claims of race and age discrimination present federal questions over which the Court has subject matter jurisdiction under 28 U.S.C. § 1331.

2.      This Court is a proper venue for Plaintiff's claims under 28 U.S.C. § 1391(b), because the Defendants reside in the Northern District of Georgia and because the unlawful conduct giving rise to the claims occurred in this District.

## THE PARTIES

3.      Crew is a resident of New York. He voluntarily subjects himself to the Court's jurisdiction.

4.      Defendant DCSD is a public corporate body and political subdivision operating in DeKalb County, Georgia. Defendant DCSD has the capacity to be sued as to each claim Crew pleads against it in this Complaint. Defendant DCSD is subject to this Court's jurisdiction, and this Court is the proper venue in which to

adjudicate this action.

5.      DCSD's governing body is the DeKalb County Board of Education. DCSD may be served with process via personal service upon its Superintendent, Cheryl Watson-Harris, at DCSD's principal offices located at 1701 Mountain Industrial Blvd, Stone Mountain, GA 30083.

6.      Defendant Dr. Joyce Morley is a resident of DeKalb County, Georgia. Defendant Morley is subject to this Court's jurisdiction and may be served with process via personal service.

7.      At all times material to this Complaint, Defendant DSCD has employed more than 500 employees.

8.      At all times material to this Complaint, Defendant DCSD was an employer within the definitions of Title VII and the ADEA.

## SATISFACTION OF EEOC PREREQUISITES AND ANTICIPATED AMENDMENT OF COMPLAINT TO ADD TITLE VII RACE DISCRIMINATION CLAIM

9.      Crew filed an EEOC race and age discrimination charge on June 29, 2020.

10.     As pled more fully below, the Board voted to reject Crew on or about May 11, 2020. Crew therefore filed his charge within less than 180 days of the last

act of race and age discrimination to which he was subjected.

11.     Crew timely filed his EEOC charge.

12.     Crew files this lawsuit more than 60 days after he filed his age discrimination EEOC charge, and his ADEA claim is therefore properly filed here. 29 CFR § 1626.18.

13.     Crew has exhausted the administrative perquisites to filing his ADEA claim.

14.     Crew's Title VII race discrimination EEOC charge will have been pending with the EEOC for 180 days as of December 26, 2020. Crew has requested the EEOC terminate its administrative processing of his Title VII charge and issue a Notice of Right to Sue pursuant to 29 C.F.R. § 1601.28(d)(2), as it is unlikely the EEOC will complete its investigation of his charge within 180 days from the date he filed it.

15.     Crew will seek leave to amend the Complaint to add his Title VII claim promptly after receiving his Notice of Right to Sue.

16.     Crew's Title VII claim arises from substantially the same facts as the 42 U.S.C. § 1981 and Equal Protection Clause claims Crew files here.

## FACTUAL ALLEGATIONS

### Plaintiff Crew

17.     Crew is a Black man.

18.     He was born September 10, 1950.

19.     At the time of the Superintendent hiring process giving rise to this case, Crew was 69 years old.

20.     Crew has been an educator and administrator in public education for nearly his entire professional life.

21.     He began his education career as a public school teacher, later taking roles in public school administration.

22.     Crew led Sacramento, California's public school system from 1988 through 1993. After that, he led the Tacoma, Washington public school system.

23.     From 1995 through 1999, Crew served as Chancellor (the top administrator) of New York City's public schools. New York City is the nation's largest public school system, with over one million students. Crew was one of the longest-serving chief administrators in the system's history.

24.     From 2004 through 2008, Crew served as Superintendent of Miami-Dade Public Schools, the nation's fourth-largest public school system.

25.     Crew has been President of Medgar Evers College in New York City from 2013 through the filing of this lawsuit.

**The DCSD Superintendent Hiring Process**

26.     In or about the second half of 2019, the Board, DCSD's governing body, decided to conduct a search for a new superintendent.

27.     The Board engaged BWP & Associates ("BWP") to conduct the search.

28.     BWP is a private firm that specializes in recruiting and vetting candidates for public school leadership positions.

29.     In or about January 2020, BWP, acting pursuant to the Board's engagement of its services, contacted Crew about DCSD's superintendent position.

30.     BWP's representative solicited Crew to apply for the DCSD superintendent position.

31.     After further discussion with BWP, Crew submitted himself as a candidate.

32.     Approximately seventy candidates applied for the DCSD position.

33.     The Board, using BWP's services and other means, conducted thorough research on the candidates' backgrounds, prior experience, qualifications,

prior media coverage, and other factors.

34.     In February 2020, BWP conducted a screening interview with Crew.

35.     Following the interview, BWP contacted references Crew had provided.

36.     In March 2020, Crew traveled to Georgia from New York for an in-person interview with the full DCSD Board.

37.     A days later, BWP told Crew he had advanced to the next round of interviews.

38.     Later in March 2020, Crew attended another in-person interview, again with the full Board.

39.     Shortly after this interview, Crew requested to speak with the Board again. The Board agreed and, on about April 23, 2020, it held a third conversation with Crew, this time virtually, due to the coronavirus.

40.     Later that day, the Board voted 6-1 to name Crew sole finalist for the superintendent position.

41.     The Board announced Crew as the sole finalist (rather than voting to hire him outright) because, pursuant to O.C.G.A. § 50-18-72, the Board was required to publicly disclose certain documents regarding the search at least 14-

days prior to taking the vote to hire Crew.

42.     Thus, the Board's announcement of Crew triggered a 14-day waiting period before the final vote to hire him would occur.

43.     In announcing Crew as sole finalist, Board Chairman Marshall Orson ("Orson"), speaking for the Board and DCSD, publicly stated:

> We heard from the community that it was paramount the candidate have deep experience as an educator, an administrator and a partner to parents, teachers and students. We are excited not only to have found a finalist who meets these criteria, but also has more than a quarter-century of experience in leading school districts, including a strong track record in heading two of the nation's largest urban districts. This positions him well to lead the DeKalb County School District, which is the third-largest school system in Georgia.

(Public statement issued by Orson, quoted at https://www.wabe.org/dekalb-school-board-names-rudy-crew-as-sole-finalist-for-superintendent/).

44.     During the 14-day waiting period following his announcement as sole finalist, Crew met with DCSD constituents and stakeholders, and he participated in DCSD-orchestrated press conferences.

45.     The Board engaged a public relations firm, Porter Novelli, to manage the public relations aspects of Crew's announcement.

46.     At the Board's directive, Porter Novelli monitored the DeKalb County public's reaction to Crew's announcement and reported on it to the Board.

47.   For example, on April 28, 2020, five days into the 14-day waiting period, Porter Novelli emailed the Board Members a detailed report informing them, among other things, that: Crew "handled himself extremely well and answered every question in detail" during a press conference, that there had been 75 print and 13 broadcast news stories on Crew's announcement and all of them were "100 percent neutral-to-positive," and that the Twitter response to the Crew announcement was "87 percent neutral-to-positive."

48.   On May 1, 2020, Porter Novelli emailed another detailed report to the Board, noting several "key takeaways." The first "key takeaway" was that "[n]egative conversation [about Crew's announcement] is not catching hold with the general public." The second "key takeaway" was: "Evidence supports the conclusion that [public opposition to Crew's selection] is a small, noisy group" based on Twitter data,  and on the fact "posts about Dr. Crew [on DCSD's Instagram channel] are often getting hundreds of likes and almost no negative comments." The email also noted that, during a protest held that day against Crew, "only two dozen people showed up [and] [i]n a district the size of DeKalb, that's not an impressive turnout."

49.   On May 6, 2020, one day before the 14-day wait period closed, Porter Novelli emailed another report to the Board Members stating that there had been a

total of 81 print and online stories and 14 broadcast media stories about the Crew announcement, "all neutral-to-positive sentiment;" and that Twitter "sentiment" on Crew's announcement was "holding at 74% neutral-to-positive."

50.    From Porter Novelli's detailed reports and, likely from other sources as well, the Board had actual knowledge that public sentiment within the District was positive toward Crew's selection and that public opposition was limited to a small group of individuals.

51.    On May 7, 2020, the Board, through its counsel, sent Crew a three-year employment agreement for Crew's acceptance via electronic signature.

52.    Nevertheless, on May 11, 2020, the Board reversed course and voted 4-3 against hiring Crew (the "Final Vote").

53.    Board Member Stanley Jester, the sole vote against Crew being named sole finalist, maintained his position and again voted against Crew's selection in the Final Vote.

54.    Board Members Diijon DaCosta, Michael Erwin, and Defendant Morley, all of whom had voted in favor of Crew as sole finalist, reversed their positions, voting against Crew's selection in the Final Vote.

## The Board Voted to Reject Crew Because of His Age

55.    Board Member Jester is substantially younger than Crew.

56.    Several days before the Board convened for the final vote, Jester was already emailing Pam Tallmadge, an executive assistant with Charter System Foundation, soliciting new candidates to replace Crew.

57.    On May 9, 2020, Tallmadge emailed Jester, stating, in part, that she had located a promising candidate, "but she may not be a good fit because of her age – stand by."

58.    Upon information and belief, Tallmadge made this statement because Jester had indicated to her that he wanted a younger candidate than Crew.

59.    On the evening of May 11, 2020 after the Board had taken the Final Vote rejecting Crew, Jeff Amy, a Staff Writer for the Atlanta Bureau of the Associated Press, emailed Jester asking to discuss "the Rudy Crew vote." Jester replied via email the same evening: "Ca[n] you please send me written questions? While I have many concerns about Crew's fit for this job, I need to be careful not to open myself to lawsuits."

60.    Board Member Jester voted to reject Crew because of his age.

61.    Board Member Diijon DaCosta, who had originally voted in Crew's

favor, switched to voting against Crew in the Final Vote.

62.    DaCosta is substantially younger than Crew.

63.    In his interactions with Crew prior to the final vote, DaCosta repeatedly expressed concerns about Crew's age.

64.    DaCosta also expressed ageist stereotypes to Crew, such as asking Crew multiple times if Crew knew how to use text messaging.

65.    Board Member DaCosta voted to reject Crew because of his age.

66.    Board Member Michael Erwin and Defendant/Board Member Morley also made negative age-related comments about Crew during the Board's discussions prior to the Final Vote rejecting Crew. They made these comments on multiple occasions, including during Board deliberations.

67.    Board Members Erwin and Morley voted to reject Crew because of his age.

68.    Well before the final vote rejecting Crew, the entire selection process was fatally tainted by Board Members' ageism. On February 27, 2020, Defendant Morley, while failing to acknowledge her own ageist bias, emailed the other Board Members about this very concern. In her email, Defendant Morley complained about Board members "attempting to influence the vote of other Board

members…especially by using discriminatory remarks about age." Defendant Morley also wrote, "it is important that this Board is aware of the legal ramifications regarding statements related to the ages of the candidates," asserting that "members of this Board have constantly and unashamedly stated their … disdain for seasoned educators with a wealth of experience and knowledge…."

69.   The Board rejected Crew because of his age.

70.   The Board knew that it was illegal to reject Crew because of his age but did so anyway.

## Defendant Morley Rejected Crew Because of Racial Animus and Caused DCSD to Reject him Because of Racial Animus

71.   Upon information and belief, Defendant Morley learned, not long before the Board's Final Vote rejecting Crew, that Crew's late wife was white.

72.   Morley is a Black woman.

73.   Morley complained to multiple people that because Crew had married a white woman, he had no respect for Black women.

74.   Morley also claimed that, in his Board interviews, Crew was too deferential to the white Board Members.

75.   Morley has a history of making incendiary racial comments about white

people.

76.   For example, during the Board's September 2020 virtual Board meeting, Defendant Morley stated that DCSD would not be able to reopen for in-person education, "because I guarantee you there's going to be those who are going to be defiant. You give an inch, they're going to take a yard. And they're whites. And we know that." The following link is to an Atlanta Journal Constitution article covering Defendant Morley's statements, which includes a video recording of her making the remarks: https://www.ajc.com/news/atlanta-news/dekalb-school-board-members-comment-about-race-rankles-some-parents/6VECI2U4Z5C4BK3DDWMARYROEU/.

77.   Morley has also repeatedly accused white Board members of discriminating against her based on race.

78.   Morley voted against Crew because of racial animus she bore against him for his marriage to a white woman and because of her negative racial sentiments about whites, to whom she believed Crew was too closely allied and/or with whom she associated Crew.

79.   Upon information and belief, Morley influenced other Board Members to vote against Crew in the Final Vote because of racially discriminatory animus,

causing the Board to reject Crew in the Final Vote.

80.    But for Morley voting against Crew because of his race, the Board's vote would have been 4-3 *in favor* of hiring Crew.

81.    The Board (and therefore Defendant DCSD) rejected Crew because of his race.

## Crew's Replacement

82.    On June 4, 2020, the Board voted to name Cheryl Watson-Harris the new sole finalist for Superintendent, having rejected Crew.

83.    In announcing Watson-Harris as the new sole finalist, Board Chairman Orson, speaking for the Board, publicly stated she was selected because, "Cheryl Watson-Harris is part of the next generation of outstanding leaders in public education."

84.    Following another 14-day waiting period, the Board voted to hire Watson-Harris as Superintendent effective July 1, 2020.

85.    Watson-Harris has served as DCSD's Superintendent since that date.

86.    Watson-Harris is substantially younger than Crew.

87.    Watson-Harris is Black and is married to a Black man.

88.    Watson-Harris was substantially less qualified for the position of

DCSD Superintendent than was Crew, and the Board knew this was the case.

89.    For example, Watson-Harris was vetted by the same search firm, during the same search process, that led to Crew's selection as sole finalist. That search process ranked Crew ahead of Watson-Harris and transmitted those rankings to the Board prior to the Board's selection of Crew as sole finalist.

90.    As further example, Crew's relevant leadership experience vastly exceeded Watson-Harris's. Crew was superintendent of four large, urban school districts prior to his DCSD candidacy, as pled *supra*, including New York public schools (the nation's largest public school system) and Miami-Dade public schools (the nation's fourth-largest public school system). Watson-Harris, in contrast, had never been superintendent of any school district prior to her selection as DCSD's new superintendent.

## **Punitive Damages Allegations Regarding Defendant Morley**

91.    Defendant Morley undertook her above-pled unlawful conduct intentionally, willfully, and maliciously with respect to Crew and his federally protected rights.

92.    Additionally, and in the alternative, Morley undertook the above-pled conduct with reckless disregard for Crew and his federally protected rights.

**42 U.S.C. § 1983 Liability Allegations Regarding Defendant Morley**

93.     At all times material to this Complaint Defendant Morley, as a member of the Board, was a governmental official subject to suit under 42 U.S.C. § 1983 in her individual capacity.

94.     When taking her actions at issue in this case, Defendant Morley acted under color of State and local law.  She took all such actions in her capacity as a Board Member and while carrying out official Board and DCSD business, which included the Superintendent hiring process.

95.     Before Morley took her actions at issue in this case, federal law clearly established that it is illegal to make employment decisions, including hiring decisions, based on race discrimination, including based on interracial marriage.

96.     By causing Crew's rejection as Superintendent because of race, Morley violated clearly established law federal law.

**42 U.S.C. § 1983 Liability Allegations Regarding Defendant DCSD**

97.     DCSD is a governmental entity subject to suit via 42 U.S.C. § 1983.

98.     The Board is DCSD's governing body. See generally O.C.G.A. § § 20-2-50.

99.   The Board exercised final decision-making authority on DCSD's behalf when carrying out the Superintendent selection and hiring process at issue in this case. See Ga. Const. Art. VIII, §V, Para. 3 (public school district superintendents shall be selected by district's board of education).

100.  The Board exercised final policy-making authority on DCDS's behalf when carrying out the Superintendent hiring process at issue in this case. *Id*.

101.  Defendant Morley participated in the Board's exercise of final decision-making and final policy-making authority over the Superintendent selection and hiring process by, *inter alia*, participating in the Board's discussions regarding same and by voting on the selection in Board meetings.

102.  But for Defendant Morley's racially motivated vote against Crew, DCSD would have hired Crew, as the final vote was 4-3 against hiring him. But for Morley, upon information and belief, influencing other Board Members to vote against Crew because of race, the vote would have been even more in favor of Crew's selection.

103.  DCSD is liable under 42 U.S.C. § 1983 for the racially discriminatory decisions of the Board at issue in this case, because the Board made those decisions in its capacity as DCSD's governing body, exercising final policymaking and final

decision making authority over the Superintendent selection process.

104.  DCSD is liable under 42 U.S.C. § 1983 for Defendant Morley's actions at issue in this case because, *inter alia*, she took those actions while participating in the Board's exercise of final decision- and final policy-making authority over the Superintendent selection and hiring process and because, but for Morley's racially motivated vote against Crew, DCSD would have hired Crew as Superintendent.

## COUNT I
## Race Discrimination against All Defendants
## 42 U.S.C. § 1981 (Actionable via 42 U.S.C. § 1983)

105.  Crew incorporates each of the above factual allegations as if fully restated here.

106.  42 U.S.C. § 1981 entitles Crew to be free from race discrimination in the making and enforcement of contracts.

107.  42 U.S.C. § 1981's prohibition on race discrimination in the making and enforcing of contracts includes a prohibition on race discrimination in the making or offering of contracts for employment.

108.  Under 42 U.S.C. § 1981, it was unlawful for Defendants to discriminate against Crew because of race when deciding whether to hire him as Superintendent.

109.  Defendants violated Crew's rights under 42 U.S.C. § 1981 by, *inter*

*alia*, failing to hire Crew as Superintendent because of Crew's marriage to a white woman; and/or because of Crew's falsely alleged lack of respect for Black women; and/or because of Crew's falsely alleged deference to white Board members; and/or because of Morley's hostility toward whites generally, with which she associated Crew.

110. As a direct and proximate result of Defendants' actions, Crew has suffered damages including lost wages and benefits, emotional distress, inconvenience, humiliation, and other indignities.

111. Defendant Morley undertook her above-pled unlawful conduct intentionally and maliciously with respect to Crew and his federally protected rights, entitling Crew to recover punitive damages against Defendant Morley in her individual capacity.

112. Additionally, and in the alternative, Defendant Morley undertook her unlawful conduct recklessly with respect to Crew and his federally protected rights, entitling Crew to recover punitive damages against her in her individual capacity.

## COUNT II
### Race Discrimination against All Defendants
### Equal Protection Clause (Actionable via 42 U.S.C. § 1983)

113. Crew incorporates each of the above factual allegations as if fully

restated here.

114.  The Equal Protection Clause of the United States Constitution entitles Crew to be free from racial discrimination by governmental entities and officials, including in the employment and hiring context.

115.  Under the Equal Protection Clause, it was unconstitutional for Defendants to discriminate against Crew because of race when deciding whether to hire him as Superintendent.

116.  Defendants violated Crew's rights under the Equal Protection Clause by, *inter alia*, failing to hire Crew as Superintendent because of Crew's marriage to a white woman; and/or because of Crew's falsely alleged lack of respect for Black women; and/or because of Crew's falsely alleged deference to white Board members; and/or because of Morley's hostility toward whites generally, with which she associated Crew.

117.  As a direct and proximate result of Defendants' actions, Crew has suffered damages including lost wages and benefits, emotional distress, inconvenience, humiliation, and other indignities.

118. Defendant Morley undertook her above-pled unlawful conduct intentionally and maliciously with respect to Crew and his federally protected

rights, entitling Crew to recover punitive damages against Defendant Morley in her individual capacity.

119.  Additionally and in the alternative, Defendant Morley undertook her unlawful conduct recklessly with respect to Crew and his federally protected rights, entitling Crew to recover punitive damages against her in her individual capacity.

## **COUNT III**
## **Age Discrimination Against Defendant DCSD**
## **Age Discrimination in Employment Act**

120.  Crew incorporates each of the above factual allegations as if fully restated here.

121.  At all times material to this Complaint, Defendant DSCD was an "employer" within the meaning of 29 U.S.C. § 630(b).

122.  Under the ADEA, it is illegal for Defendant DCSD to fail or refuse to hire an individual because of the individual's age. 29 U.S.C. § 623(a).

123.  Defendant DSCD violated Crew's rights under the ADEA by, *inter alia*, failing or refusing to hire him because of his age.

124.  As a direct and proximate result of DCSD's actions, Crew has suffered damages including lost wages and benefits.

125.  DCSD's discriminatory acts were willful within the meaning of the

ADEA, and Crew is therefore entitled to liquidated damages under 29 U.S.C. § 626(b).

## **PRAYER FOR RELIEF**

Plaintiff Crew respectfully requests the following relief:

a. declaratory judgment that Defendants violated Plaintiff's rights under the 42 U.S.C. § 1981 and the Equal Protection Clause, and that Defendant DCSD violated Plaintiff's rights under the ADEA;

b. an injunction prohibiting the Defendants from engaging in such unlawful conduct in the future;

c. full back pay, with prejudgment interest thereon;

d. liquidated damages pursuant to the ADEA against DCSD;

e. compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

f. punitive damages against Defendant Morley in her individual capacity, in an amount to be determined by the enlightened conscience of the jury, to punish Defendant Morley for her conduct toward Plaintiff and deter her from similar conduct in the future;

g.    reasonable attorneys' fees and costs; and

h.    other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO**

**TRIABLE.**

Respectfully submitted October 26, 2020.

**LEGARE, ATTWOOD & WOLFE, LLC**

By:    */s/ Steven E. Wolfe*
Steven E. Wolfe
Georgia Bar No. 142441
Marissa R. Torgerson
Georgia Bar No. 848356

Decatur Town Center Two
125 Clairemont Avenue, Suite 380
Decatur, Georgia 30030
T: (470) 823-4000 | F: (470) 201-1212
sewolfe@law-llc.com
mrtorgerson@law-llc.com
Counsel for Plaintiff